1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         SOUTHERN DISTRICT OF CALIFORNIA

10

11   EDWARD SIALOI, *et al.*,                  Case No. 11-cv-2280-W(KSC)

12                              Plaintiffs,    **ORDER GRANTING IN PART**
                                               **AND DENYING IN PART**
13          v.                                 **DEFENDANTS' MOTION FOR**
                                               **SUMMARY JUDGMENT**
14   CITY OF SAN DIEGO, *et al.*,              **[DOC. 36]**

15                              Defendants.

16

17          On October 1, 2011, Plaintiffs commenced this civil-rights action against

18   Defendants, which includes the City of San Diego and several police officers, arising

19   from a contact between the officers and Plaintiffs on October 2, 2010.[1]  Now pending

20   before the Court is Defendants' motion for summary judgment.  Plaintiffs oppose.

21          The Court decides the matter on the papers submitted and without oral

22   argument.  See Civ. L.R. 7.1(d.1).  For the following reasons, the Court **GRANTS IN**

23   **PART** and **DENIES IN PART** Defendants' motion for summary judgment.

24

25          ────────────────

26          [1] The plaintiffs in this action are Edward Sialoi, Kelli Sialoi, Sialoi ("Junior") Sialoi, Jr.,
     September Sialoi, Foleni Sialoi, Gayle Pasi, Lago Sialoi, Liua Sialoi, Hardy Teo Falealili, Tapili Sofa,
27   and minors G.S., T.O.S., T.A.S., T.R.S., and B.F.  The defendants in this action are the City of San
     Diego, Allen Sluss, Bradley Phelps, Joseph Krawczyk, David Rohowits, Anthony Reese, Michael Hall,
28   Edward Kaszycki, Corey Stasch, Miguel Garcia, Michael Hayes, Wade Irwin, Scott Smith, Kelvin
     Lujan, and John Carroll.  The Court will refer to all plaintiffs collectively as "Plaintiffs" and all
     defendants collectively as "Defendants."

# I.   BACKGROUND[2]

On October 2, 2010, at 10:22 p.m., the manager of the apartment complex located at 404 47th Street in San Diego called 9-1-1 to report "two black or Samoan males carrying a shotgun and a handgun, ducking down" as if waiting for somebody. (CAD 1; Sluss Dep. 40:3–9.)   The apartment manager called back two minutes later to clarify that both suspects are black males, one with bushy hair and wearing a brown T-shirt, and the other wearing a long-sleeved T-shirt with a hood.   (CAD 1.)   The apartment manager's 9-1-1 calls coincided with a birthday gathering hosted by Junior Sialoi and his wife, September Sialoi, on the ground floor of the 47th Street apartment complex.   (Lago Sialoi Decl. ¶ 2; Sluss Dep. 40:3–9.)   People attending the party were "having coffee and birthday cake, singing songs and enjoying each other's company." (Edward Sialoi Decl. ¶ 4.)

Sgt. Allen Todd Sluss was in charge of the response to the apartment manager's 9-1-1 call.   (Sluss Dep. 44:10–20; see also CAD 1.)   Sgt. Sluss assembled an initial contact team consisting of "maybe six officers, and then [he] put Officer Doeden with a team of four and had them take another path." (Sluss Dep. 49:3–15.)   At about 10:30 p.m., the "initial contact team came up the driveway," while the second team "circle[d] around from the north."   (Id.; CAD 2.)   The remainder of what transpired is disputed by the parties.

According to Defendants, contact with Plaintiffs began when Officer Wayne Doeden saw the 15-year-old G.S. throw what appeared to be a gun under a truck in the apartment parking lot.   (Doeden Dep. 40:1–42:20; G.S. Dep. 51:2–19; Lago Sialoi Decl. ¶¶ 5–8.)   Officer Doeden then pointed his light on the object thrown under the truck and called out to the other officers, "Gun under the truck."   (Doeden Dep. 42:2–22, 45:20–46:13.)   G.S. tried to explain that the gun is "fake" and that "it's just a toy," but

---

[2] The Court **GRANTS** Defendants' unopposed request for judicial notice of the computer-assisted dispatch printout ("CAD") under Federal Rule of Evidence 201(b) because its "accuracy cannot reasonably be questioned." (Doc. 36-2.)   The CAD printout is attached to Defendants' motion as Exhibit 2.

Officer Doeden shouted "it's real" to the other officers. (Id. at 45:20–46:13, 49:2–50:21; G.S. Dep. 55:2–23.) While this exchange was occurring, one or more persons moved from the nearby crowd outside into the apartment, creating a greater concern that weapons or other suspects were moved into the apartment. (Krawcyzk Dep. 35:1–19, 52:7–24, 80:14–81:25; Doeden Dep. 81:5–24, 82:15–84:1.) Following police commands, three males laid on the ground, were handcuffed, and put into patrol cars. (B.F. Dep. 39:14–17; G.S. Dep. 54:11–20; T.O.S. Dep. 28:10–14.) Securing these three individuals took about two minutes. (CAD 2.)

Police officers then started securing the other individuals who were near where the gun was thrown. (Doeden Dep. 55:18–57:14, 59:3–20.) They first "called out," one by one, the nine people gathered in front of the apartment. (Sluss Dep. 161:16–162:5, Krawczyk Dep. 54:3–15; CAD 2.) These individuals were handcuffed, patted down, and moved approximately thirty to forty feet from the gun and the apartment. (Sluss Dep. 161:16–162:5; Krawczyk Dep. 74:20–75:11.) Junior Sialoi was among these nine individuals, and according to Defendants, he was particularly unruly, refusing to put his hands up in the air and failing to heed his family's pleas to calm down. (Doeden Dep. 63:10–64:14, 86:21–24; Sialoi Sialoi Dep. 48:14–49:18, 75:1–19; 79:7–80:25.) Next, police instructed two women and one child still inside the apartment to come outside one by one. (Doeden Dep. 81:5–84:23.) These individuals were not handcuffed, but patted down and escorted to the group of others previously secured. (Sluss Dep. 121:23–122:12, 130:5–12.)

From 10:43 p.m. to 10:44 p.m., police officers conducted a protective sweep of the apartment. (CAD 2; Sluss Dep. 164:2–6.) Seventeen minutes after seeing the male with a gun in his hand, police uncuffed all of the individuals who had been restrained. (Sluss Dep. 165:4–10; CAD 3.)

Plaintiffs present the events that transpired differently. According to Plaintiffs, police officers with guns drawn first encountered 13-year-old B.F. and then 15-year-old T.O.S. (Sialoi Sialoi Decl. ¶ 6.) B.F. was in an open parking lot with nothing in his

1    hands when the officers approached.  (B.F. Dep. 39:18–40:9, 41:25–42:2.)  Officers

2    coming up the driveway with guns pointed at the minors "all screamed" to "[g]et on the

3    ground."  (Id. at 45:6–46:24; Sialoi Sialoi Decl. ¶ 6.)  Once B.F. was on the ground, he

4    felt a knee on his back as an officer handcuffed him.  (B.F. Dep. 52:3–25.)  The officer

5    then instructed B.F. to get up, but he could not because his hands were handcuffed

6    behind his back.  (Id.)  Shortly thereafter, the officer "yanked" B.F. up, patted him

7    down, and put him inside of a police car."  (Id.)

8         T.O.S. was standing "a couple feet away" from B.F. when the group of police

9    officers approached.  (B.F. Dep. 41:17–24.)  He also had nothing in his hands.  (Id.)

10   From the ground, T.O.S. observed a police officer picking up the weapon—which the

11   parties appear to agree was actually a paintball gun—and saying that he "found the gun

12   . . . found the weapon," despite multiple attempts by T.O.S.'s father to inform the

13   officer that "[i]t was a toy gun."  (T.O.S. Dep. 73:3–25; Lago Sialoi Decl. ¶ 5.)  T.O.S.

14   was then "told to face forward while the officer came and kneed [his] neck" and told

15   him to put his arms behind his back.  (T.O.S. Dep. 73:11–16.)  T.O.S. felt pain as well

16   as tingling and numbness in both of his hands because of the handcuffs, but after he told

17   officers of the pain and asked them to loosen the handcuffs, they responded that he had

18   to "deal with it."  (Id. at 76:12–77:24.)  Out of fear that the officers "might do

19   something," T.O.S. did not complain any further.  (Id. at 77:16–24.)  While officers

20   restrained T.O.S., they had weapons pointed at him, including "the barrel of the

21   officer's gun only an inch or so from T.O.S.'s head," and an "AR-15 pointed right at

22   him from only a foot or two away."  (Sialoi Sialoi Decl. ¶ 10; G.S. Dep. 83:6–84:16.)

23        Fifteen-year-old G.S. "was in between two trucks" near B.F. and T.O.S.  (B.F.

24   Dep. 41:19–21.)  When the minors first saw the police officers approaching, G.S. had

25   a plastic paintball gun in his hand.  (Id. at 42:8–14; G.S. Dep. 73:2–11.)  At some point

26   after the police officers engaged the minors, G.S. dropped the paintball gun.  (Lago

27   Sialoi ¶ 6.)  They "yell[ed] at G.S. to get down" with guns pointed him, and G.S.

28   immediately complied and got down on the ground.  (Id. ¶¶ 7–8.)  G.S.'s father also

-4-

1    told G.S. to get down.  (Id.)  While he was on the ground, G.S. continued to explain

2    that the weapon is not a real gun but rather a toy paintball gun, to which a police

3    officer responded, "I don't care, just crawl out."  (G.S. Dep. 80:10–21.)  However,

4    another officer instructed G.S. to "get down and put [his] hands in front," which he did.

5    (Id. at 55:2–23.)  With his hands out while on the ground, G.S. asked how he is

6    supposed to crawl out, and one of the officers told him to "use your face."  (Id.)

7    Eventually, G.S. crawled out, and then he was handcuffed and taken away. (Lago Sialoi

8    ¶ 10.)

9         While the three minors were on the ground in handcuffs, the police officers

10   began ordering other Sialoi family members, "one at a time, to walk out to them, where

11   officers searched and handcuffed them." (Lago Sialoi Decl. ¶ 11; see also Edward Sialoi

12   Decl. ¶ 3; Sialoi Sialoi Decl. ¶ 12.)  The family members searched and handcuffed

13   included two women, Liua Sialoi and September Sialoi, and 13-year-old T.A.S. (Lago

14   Sialoi Decl. ¶ 11.)  During the whole process of searching and handcuffing the other

15   Sialoi family members, police officers had their guns drawn and pointed at them.

16   (Edward Sialoi Decl. ¶ 9.)  Edward Sialoi even observed "red laser dots" on his brother

17   Junior Sialoi and his 13-year-old niece T.A.S., who was also handcuffed and attempted

18   to inform an officer that the handcuffs were causing pain.  (Id.; see also T.A.S. Dep.

19   56:19–58:3, 93:1–24.)  Liua Sialoi was pregnant at the time.  (Liua Sialoi Dep.

20   101:12–103:22.)

21        Upon the officers' instructions, Foleni Sialoi walked out to the officers first, was

22   searched, handcuffed, and taken to the curb.  (Edward Siaoli Decl. ¶¶ 10–14; Lago

23   Sialoi ¶¶ 11–15; Sialoi Sialoi Decl. ¶¶ 12–16.)  Next, Junior Sialoi was ordered out.

24   (Id.)  Then Edward Sialoi.  (Id.)  Edward Sialoi informed the officers that he had a

25   medical condition and that he recently had back surgery, prompting him to request that

26   the officers use two sets of handcuffs.  (Edward Sialoi ¶ 13.)  However, when he got to

27   the officer, the officer "grabbed [his] right hand and violently yanked [his] back arm

28   back and up behind [him], causing excruciating pain in [his] shoulder."  (Id.)  Edward

-5-

Sialoi heard a "loud pop in [his] shoulder." (Id.)  Thereafter, officers ordered the remaining people in the apartment to come out, including Kelli Sialoi, Gayle Pasi, 7-year-old T.R.S., and Gayle Pasi's 3-year-old nephew. (Id. ¶ 15.)  Neither Kelli Sialoi nor Gayle Pasi were patted down or handcuffed. (Id.)  Officers directed all of the family members to wait on the curb, except for Junior Sialoi who was taken to a police car with the three minors detained earlier. (Edward Sialoi Decl. ¶ 14–15; Lago Sialoi Decl. ¶¶ 15–16; Sialoi Sialoi Decl. ¶ 14.)

Without consent or a search warrant, three or four police officers then walked into Junior Sialoi's apartment, and after about five minutes, came out. (Sialoi Sialoi Decl. ¶ 16; Edward Sialoi Decl. ¶ 15.)  After about 30 to 40 minutes, everyone was released. (Lago Sialoi Decl. ¶ 17.)  The following Monday, Edward Sialoi went to urgent care for treatment because of severe and constant pain in his shoulder and biceps area. (Edward Sialoi Decl. ¶ 18.)  Eventually, he was referred to an orthopedic surgeon who conducted an MRI examination, which showed that Edward Sialoi had a torn rotator cuff and torn labrum in his shoulder. (Id.)  During the subsequent surgery, it was determined that there was a torn biceps tendon, which was also repaired during the surgery. (Id.)  The following Wednesday, Junior Sialoi went to the San Diego Police Department in Downtown San Diego to get the police reports relating to this incident, but was informed that there were no such reports. (Sialoi Sialoi Decl. ¶ 17.)

On October 3, 2011, Plaintiffs commenced this civil-rights action in federal court.  In the complaint, Plaintiffs assert claims: (1) constitutional violations for unlawful search and seizure and excessive force under 42 U.S.C. § 1983; (2) constitutional violations for unlawful policies, customs or habits under 42 U.S.C. § 1983; (3) negligence; (4) assault and battery; (5) false arrest / false imprisonment; and (6) civil-rights violations under California Civil Code § 52.1(b).  Plaintiffs subsequently amended their complaint twice, asserting the same claims.  Plaintiffs bring all of their claims against all of the defendants, except the claim for unlawful search and seizure, and excessive force, which is brought against "all individually named defendants," and

the claim for unlawful policies, customs or habits, which is brought against the City of San Diego.  Defendants now move for full or partial summary judgment.  Plaintiffs oppose.

## II.   LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  Id. at 322-23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein."  Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001).  Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact."  Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing Richards v. Combined Ins. Co. of Am., 55 F.3d 247, 251 (7th Cir. 1995)).  If the

11cv2280

1 moving party fails to discharge this initial burden, summary judgment must be denied
2 and the court need not consider the nonmoving party's evidence. <u>Adickes v. S.H. Kress</u>
3 <u>& Co.</u>, 398 U.S. 144, 159-60 (1970).

4     If the moving party meets this initial burden, the nonmoving party cannot defeat
5 summary judgment merely by demonstrating "that there is some metaphysical doubt as
6 to the material facts." <u>Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475
7 U.S. 574, 586 (1986); <u>Triton Energy Corp. v. Square D Co.</u>, 68 F.3d 1216, 1221 (9th
8 Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving
9 party's position is not sufficient.") (citing <u>Anderson</u>, 477 U.S. at 242, 252). Rather, the
10 nonmoving party must "go beyond the pleadings" and by "the depositions, answers to
11 interrogatories, and admissions on file," designate "specific facts showing that there is
12 a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

13     When making this determination, the court must view all inferences drawn from
14 the underlying facts in the light most favorable to the nonmoving party. <u>See</u>
15 <u>Matsushita</u>, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and
16 the drawing of legitimate inferences from the facts are jury functions, not those of a
17 judge, [when] he [or she] is ruling on a motion for summary judgment." <u>Anderson</u>, 477
18 U.S. at 255.

19     Rule 56(d) provides for partial summary judgment. <u>See</u> Fed. R. Civ. P. 56(d)
20 ("[T]he court . . . shall if practicable ascertain what material facts exist without
21 substantial controversy and what material facts are actually and in good faith
22 controverted."). Under Rule 56(d), the court may grant summary judgment on less
23 than the non-moving party's whole claim. <u>Zapata Hermanos Sucesores, S.A. v.</u>
24 <u>Hearthside Baking Co., Inc.</u>, 313 F.3d 385, 391 (7th Cir. 2002) (Posner, J.). Partial
25 summary judgment is a mechanism through which the court deems certain issues
26 established before trial. <u>Lies v. Farrell Lines, Inc.</u>, 641 F.2d 765, 769 n.3 (9th Cir.
27 1981). "The procedure was intended to avoid a useless trial of facts and issues over
28 which there was really never any controversy and which would tend to confuse and

1 complicate a lawsuit." Id.

2

3 **III.   DISCUSSION**

4     **A.   Civil Rights Violations Under 42 U.S.C. § 1983**

5        To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential

6 elements: (1) that a right secured by the Constitution or laws of the United States was

7 violated, and (2) that the alleged violation was committed by a person acting under the

8 color of state law. West v. Atkins, 487 U.S. 42, 28 (1988).  Section 1983 is not itself

9 a source of substantive rights, but merely provides "a method for vindicating federal

10 rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94 (1989) (quoting

11 Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)).  Plaintiffs contend that Defendants

12 violated their Fourth Amendment rights as a result of the police officers' unlawful

13 searches and arrests, use of excessive force during the arrests, and unlawful search of

14 Junior Sialoi's apartment.   They also contend that there was a deprivation of

15 constitutional rights as a result of the City of San Diego's policies, customs, and habits.

16

17       **1.   Unlawful Searches and Arrests**

18        Warrantless arrest without probable cause violates the Fourth Amendment.

19 Beck v. Ohio, 379 U.S. 89, 91 (1964); Dubner v. City & Cnty. of San Francisco, 266

20 F.3d 959, 964 (9th Cir. 2001).  "Probable cause exists when, at the time of arrest, the

21 agents know reasonably trustworthy information sufficient to warrant a prudent person

22 in believing that the accused had committed or was committing an offense." Allen v.

23 City of Portland, 73 F.3d 232, 237 (9th Cir. 1995) (quotation marks and citation

24 omitted).  Where the source of police information about a suspect is an eyewitness to

25 the crime, probable cause to arrest the suspect may exist even in the absence of an

26 independent showing of the reliability of the source so long as the witness is fairly

27 certain of the identification.  See United States v. Hammond, 666 F.2d 435, 439 (9th

28 Cir. 1982).  Additionally, probable cause must be individualized to the specific person

1  arrested.  Maryland v. Pringle, 540 U.S. 366, 371 (2003).

2         A detention is less intrusive than an arrest, and requires a lesser standard of
3  "reasonable suspicion" of unlawful activity for officers to detain lawfully.  Washington
4  v. Lambert, 98 F.3d 1181, 1185 (9th Cir. 1996).  A detention is often indicated by less
5  aggressive tactics and less force used by officers.  Id.  Additionally, if the suspects are
6  uncooperative, an officer's behavior will more likely constitute a detention rather than
7  in arrest.  Allen v. City of Los Angeles, 66 F.3d 1052, 1057 (9th Cir. 1995) (holding
8  that a driver's high speed and refusal to pull over constituted enough resistance to
9  establish officer conduct as a detention, only requiring reasonable suspicion for a the
10 officers to lawfully detain).

11        Defendants argue that Officer Doeden "had a reasonable belief that a gun crime
12 was committed" when he saw G.S. throw a gun that "he reasonably [] believed to be a
13 real gun." (Defs.' Mot. 9:9–15.)  They contend that "[t]he police actions flowed from
14 Officer Doeden's conclusion that a gun crime was committed[,]" and "[t]he safety
15 precautions of [the] police were reasonable under these circumstances." (Id.)  In
16 addition to Officer Doeden's conduct when he approached G.S. and found the gun,
17 Defendants also identify other relevant facts that purportedly justify their conduct, such
18 as the urgency of the 9-1-1 gun call, being "shorthanded relative to the three males with
19 a gun in the parking lot[,]" the numerous suspects outside the apartment during the
20 contact, the unknown number of suspects inside the apartment, the suspects' verbal
21 chatter, and movement of suspects in the "earliest moments of this event." (Id. at
22 13:23–14:7.)

23        Plaintiffs respond by identifying two purported "key facts" that Defendants fail
24 to address: (1) the gun that G.S. was holding was a toy, and (2) officers confirmed it was
25 a toy at the beginning, "within seconds of their arrival." (Pls.' Opp'n 8:13–15.)  They
26 continue that "[f]ollowing the discovery of the toy gun, officers lacked reasonable
27 suspicion to believe that any of the plaintiffs were involved in criminal activity[,]" and
28 "they certainly had no reasonable belief that any plaintiff was armed and dangerous."

11cv2280

1   (Id. at 8:16–19.)  Plaintiffs contend that "[n]o plaintiff did anything unlawful or made
2   any type of furtive movements suggesting they were armed or dangerous."  (Id. at
3   8:20–9:5.)  They also direct to the Court's attention to the fact that the apartment
4   manager updated his description of the suspects two minutes after the initial 9-1-1 call,
5   describing two black males instead, one in a brown short-sleeve T-shirt with bushy hair
6   and the other in a long-sleeve T-shirt with a hood.  (See CAD 1.)

7        The parties present different and competing narratives of the events that
8   transpired on the evening of October 2, 2010 in and near Junior Sialoi's apartment.
9   Defendants present evidence that the police officers were entering an unknown and
10  potentially dangerous situation following the 9-1-1 "gun call."  And it is that potential
11  danger that justified the decision to have multiple officers on the scene in order to
12  investigate threats and assure the safety of everyone.  Plaintiffs present evidence that
13  the police officers on the scene knew that there was no threat from Plaintiffs when they
14  discovered early on that the gun in question was a toy paintball gun.  Adding to that
15  narrative is the undisputed fact that the police received an update from the 9-1-1 caller
16  that the suspects were two black males.  The parties appear not to dispute that the
17  group of minors who the police officer may have presumed were the suspects in question
18  were neither black nor two in number; B.F, T.O.S., and G.S. simply did not match the
19  updated description.  Though there are other relevant facts to consider, some disputed
20  and some not, these are the inferences that the parties ask the Court to make from their
21  evidence.

22       Drawing all of the inferences in light most favorable to the nonmoving party, the
23  Court cannot conclude that Defendants are entitled to summary judgment.  See
24  Matsushita, 475 U.S. at 587.  For the Court to reach the conclusion that the police
25  officers' conduct was justified by probable cause or reasonable suspicion would require
26  credibility determinations, the weighing of evidence, and the drawing of inferences from
27  the facts.  See Anderson, 477 U.S. at 355.  Those considerations are not appropriate
28  for the Court when ruling on a motion for summary judgment.  See id.  Consequently,

1    there is a genuine issue of material fact regarding the justification of the police officers'

2    conduct, including probable cause and reasonable suspicion. See id. The scope of the

3    officers' conduct in question includes the aforementioned searches and arrests.

4         Defendants also dispute that the police officers "arrested" Plaintiffs. (Defs.' Mot.

5    14:8–13.) For the same reasons that the Court finds there is a genuine issue of material

6    fact as to the justification of the police officers' conduct, the Court also finds that there

7    is a genuine issue of material fact as to whether Plaintiffs were arrested or merely

8    detained. See Washington, 98 F.3d at 1185-92. For simplicity, and because the Court

9    draws all inferences in favor of the nonmoving party, the Court shall refer to any

10   restraint described by the parties in this order as an "arrest."

11        Accordingly, the Court **DENIES** summary judgment as to Plaintiffs' unlawful

12   search and arrest claim brought under 42 U.S.C. § 1983. See Dubner, 266 F.3d at 964;

13   Washington, 98 F.3d at 1185.

14

15              **2.      Excessive Force**

16        Use of excessive force violates the Fourth Amendment when the force applied

17   is greater than is reasonable under the circumstances. Santos v. Gates, 287 F. 3d 846,

18   854 (9th Cir. 2002). Excessive force is an objective determination that can include

19   pointing guns at unarmed individuals, use of handcuffs, or force of any kind if a fact-

20   finder determines it was not necessary to an objectively reasonable police officer in the

21   circumstances. Graham, 490 U.S. at 397; Espinosa v. City & Cnty. of San Francisco,

22   598 F.3d 528, 538 (9th Cir. 2010); Palmer v. Sanderson, 9 F.3d 1433, 1436 (9th Cir.

23   1993). "[S]ummary judgment . . . in excessive force cases should be granted sparingly."

24   Luchtel v. Hagemann, 623 F.3d 975, 980 (9th Cir. 2010) (quoting Smith v. City of

25   Hemet, 394 F.3d 689, 701 (9th Cir. 2005)) (internal quotation marks omitted).

26        Whether an individual has been subjected to excessive force under the Fourth

27   Amendment requires consideration of the reasonableness standard set forth in Graham.

28   490 U.S. at 395. To determine whether officers used excessive force during an arrest,

1   courts balance "the nature and quality of the intrusion on the individual's Fourth
2   Amendment interests against the countervailing governmental interests at stake,"
3   looking to (1) the severity of the crime at issue, (2) whether the plaintiff posed an
4   immediate threat to the safety of the officers or others, and (3) whether the plaintiff
5   actively resisted arrest or attempted to evade arrest by flight.  Id. (internal quotation
6   marks omitted).  The threat posed by the suspect is the most important factor.  Smith,
7   394 F.3d at 689.  Then the court must consider the totality of the circumstances and
8   weigh the gravity of the intrusion against the government's interest in order to
9   determine whether the force employed was constitutionally reasonable.  Miller v. Clark
10  Cnty., 340 F.3d 959, 964 (9th Cir. 2003).  "'[R]easonableness' of a particular use of
11  force must be judged from the perspective of a reasonable officer on the scene, rather
12  than with the 20/20 vision of hindsight."  Id. at 396.

13      When weighing an excessive-force claim, summary judgment is appropriate if the
14  Court "concludes, after resolving all factual disputes in favor of the plaintiff, that the
15  officer's use of force was objectively reasonable under the circumstances."  Scott v.
16  Heinrich, 39 F.3d 912, 915 (9th Cir. 1994).  Alternatively, "the court may make a
17  determination as to the reasonableness where, viewing the evidence in the light most
18  favorable to [the plaintiff], the evidence compels the conclusion that [the officers'] use
19  of force was reasonable."  Hopkins v. Andaya, 958 F.2d 881, 885 (9th Cir. 1992).  The
20  Court can therefore grant summary judgment if the force the officers used was
21  appropriate in any circumstance, or if the circumstances in the specific case were such
22  that the only conclusion is that the force was reasonable.

23      Defendants argue that the "[t]he use of force arose from safety concerns, not
24  merely a reasonable suspicion of a crime." (Defs.' Mot. 4:14–18, 13:23–14:27.)  They
25  also contend that Plaintiffs' contention that the handcuffs were too tight is a separate
26  and distinct issue from whether the handcuffs were lawfully used.  (Id. at 5:1–2.)
27  However, the only analysis that Defendants provide conflates their argument addressing
28  the purported justified searches and arrests with the purported justified application of

-13-

1   force.  (See Defs.' Mot. 11:18–14:27; Defs.' Reply 9:15–19.)  Defendants do separately
2   argue that the application of force in handcuffing Edward Sialoi was justified.  (Id. at
3   17:11–21.)  Notwithstanding Edward Sialoi, it appears Defendants link their excessive-
4   force argument to the presumption that there was probable cause or reasonable
5   suspicion to justify the officers' conduct.  (See id. at 9:9–15 ("The police actions flowed
6   from Officer Doeden's conclusion that a gun crime was committed.  The safety
7   precautions of police were reasonable under these circumstances.").)  In response,
8   Plaintiffs argue that factual disputes exists regarding excessive force.  They highlight the
9   application of force to Edward Sialoi as well as the "excessively tight handcuffs" applied
10  to and the pointing of guns at Defendants.  (Pls.' Opp'n 14:1–16:14.)

11      According to Defendants, after Edward Sialoi notified officers of his pre-existing
12  right shoulder injury, "his hands were on his head and [] an officer pulled his right arm
13  down from head area to lower back area."  (Defs.' Mot. 17:11–21.)  They argue this
14  application of force was not unreasonable outside the expected use of handcuffs.  (Id.)
15  Plaintiffs add that Edward Sialoi had requested two sets of handcuffs, that he heard a
16  loud "pop," that his arm was "twisted [] fast and hard to the point where [he] heard
17  [his] shoulder pop," and that when his handcuffs were being removed later, another
18  officer yanked up his cuffed wrists, causing more pain.  (Pls.' Opp'n 14:8–21.)  The
19  circumstances surrounding Edward Sialoi's interaction remain in dispute.  In particular,
20  it is disputed what threat, if any, Edward Sialoi posed to the officers.  See Graham, 490
21  U.S. at 395.  Furthermore, the unresolved question of whether the police officers'
22  conduct was justified—by probable cause, reasonable suspicion, or some other
23  theory—my impact the answer of how much force was reasonable in this circumstance.

24      In sum, the Court **DENIES** summary judgment as to Plaintiffs' excessive-force
25  claim brought under 42 U.S.C. § 1983 because material facts remain in dispute
26  regarding, in part, Edward Sialoi's interaction with police officers as well as the
27  application of handcuffs to and the pointing of guns at Defendants throughout the
28  encounter.  See Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 322.  Summary judgment

1  is also inappropriate because the justification for Defendant's encounter with
2  Plaintiffs—e.g., probable cause and reasonable suspicion—remain in dispute as well.
3  See id.

4

5          **3.     Unlawful Search of Junior Sialoi's Apartment**

6          "It is a 'basic principle of Fourth Amendment law' that searches and seizures
7  inside a home without a warrant are presumptively unreasonable." Payton v. New
8  York, 445 U.S. 573, 586 (1980).  "The Fourth Amendment prohibits police officers
9  from making a warrantless entry into a person's home, unless the officers have probable
10 cause *and* are presented with exigent circumstances." LaLonde v. Cnty. of Riverside,
11 204 F.3d 947, 954 (9th Cir. 2000) (emphasis in original).

12         "[A]s an incident to the arrest[,] the officers could, as a precautionary matter and
13 without probable cause or reasonable suspicion, look in closets and other spaces
14 immediately adjoining the place of arrest from which an attack could be immediately
15 launched." Maryland v. Buie, 494 U.S. 325, 334 (1990).  "Beyond that, however . . .
16 there must be articulable facts which, taken together with the rational inferences from
17 those facts, would warrant a reasonably prudent officer in believing that the area to be
18 swept harbors an individual posing a danger to those on the arrest scene." Id.  For
19 example, "a law enforcement officer present in a home under lawful process, such as an
20 order permitting or directing the officer to enter for the purpose of protecting a third
21 party, may conduct a protective sweep when the officer possesses [the aforementioned
22 'articulable facts']." United States v. Miller, 430 F.3d 93, 98 (2d Cir. 2005) (citing
23 Buie, 494 U.S. at 334).

24         Defendants argue that a preventative sweep of a residence without a warrant
25 based upon safety concerns is permissible.  (Defs.' Mot. 15:23–17:10.)  They present
26 two grounds to justify the search: (1) "[t]here were, incident to the probable cause to
27 arrest G.S. for a gun crime, exigent circumstances to search the apartment for other
28 persons posing an imminent danger to police standing outside the apartment"; and (2)

1   "the officers had reasonable suspicion of criminal activity by these Plaintiffs." (Defs.'

2   Reply 6:19–8:18.)   As discussed above, the basis to find either probable cause or

3   reasonable suspicion remains in dispute.   Consequently, neither justifies the police

4   officers' search of the apartment for the purposes of summary judgment. See LaLonde,

5   204 F.3d at 954; see also Miller, 430 F.3d at 98.

6        Additionally, inferences drawn in favor of Plaintiffs suggest that there were no

7   exigent circumstances.  Plaintiffs provide evidence that no crime had been committed,

8   and no crime was in progress.  Officer Sluss even testified that he did not see anything

9   in the hands of anybody other than one person—presumably, G.S.—and that everyone

10  on the scene was "compliant physically" and followed his orders. (Sluss Dep. 75:5–23.)

11  Thus, the exigency of the circumstances also remains in dispute.  See LaLonde, 204

12  F.3d at 954.

13       Accordingly, the Court **DENIES** summary judgment as to the unlawful search

14  of Junior Sialoi's apartment because genuine issues of material fact exist regarding

15  probable cause, reasonable suspicion, and the exigency of the circumstances.  See

16  LaLonde, 204 F.3d at 954.

17

18       **4.    Qualified Immunity**

19       "The doctrine of qualified immunity protects government officials 'from liability

20  for civil damages insofar as their conduct does not violate clearly established statutory

21  or constitutional rights of which a reasonable person would have known.'" Pearson v.

22  Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818

23  (1982)).  "Qualified immunity balances two important interests—the need to hold

24  public officials accountable when they exercise power irresponsibly and the need to

25  shield officials from harassment, distraction, and liability when they perform their duties

26  reasonably." Id.

27       In Saucier v. Katz, 533 U.S. 194, 201 (2001), the Supreme Court established a

28  two-prong analysis to determine whether qualified immunity applies.  The two-prong

analysis considers whether the plaintiff has alleged a violation of a constitutional right and/or whether the right at issue was "clearly established" at the time of the alleged misconduct. Pearson, 555 U.S. at 231-32. To be "clearly established" for the purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Furthermore, the district court has "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236.

For summary-judgment purposes, the facts must be viewed in the light most favorable to the nonmoving party if there is a genuine dispute over material facts. Scott v. Harris, 550 U.S. 372, 380 (2007) (holding that a video tape proving the plaintiff's factual story untrue negated a "genuine" dispute of material facts). If facts necessary to decide the issue of qualified immunity are in dispute, then summary judgment granting qualified immunity is not proper. Acosta v. City & Cnty. of San Francisco, 83 F.3d 1143, 1147-48 (9th Cir. 1996); Barlow v. Ground, 943 F.2d 1132, 1136 (9th Cir. 1991).

Defendants argue that all of the police officers are entitled to qualified immunity even "[i]f we assume probable cause did not exist for the arrest of [G.S.]" (Defs.' Mot. 17:22–21:16.) Defendants do not, however, challenge Plaintiffs' assertion that they adequately assert a violation of a constitutional right and that the right in issue was "clearly established" at the time. (See Pls.' Opp'n 20:2–22:13; Defs.' Reply 8:19–9:6.) Rather, Defendants focus on the factual circumstances of the police officers' encounter with Plaintiffs. (See Defs.' Reply 8:19–9:6.) But those facts, which must be resolved before determining whether the officers are protected by the doctrine of qualified immunity, remain in dispute. Therefore, granting qualified immunity is improper at this time, and the Court **DENIES** summary judgment as to qualified immunity. See Acosta, 83 F.3d at 1147-48; Barlow, 943 F.2d at 1136.

11cv2280

### 5.      Unconstitutional Custom or Policy

Municipalities are "persons" under 42 U.S.C. § 1983 and thus may be liable for causing a constitutional deprivation. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). Monell liability may arise when a locality has an "official custom or policy" that requires its officers to engage in illegal behavior. Connick v. Thompson, — U.S. —, —, 131 S. Ct. 1350, 1359 (2011). Under Monell, to prevail in a civil action against a local governmental entity, a plaintiff must establish "(1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" Oviatt By & Through Waugh v. Pearce, 954 F.2d 1470, 1474 (9th Cir.1992) (quoting City of Canton v. Harris, 489 U.S. 378, 389-91 (1989)). A policy is "a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Id. at 1477 (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986) (plurality opinion)).

A municipality may not be sued under § 1983 solely because an injury was inflicted by its employees or agents. Monell, 436 U.S. at 694. It is only when execution of a government's policy or custom inflicts the injury that the municipality as an entity is responsible. Id.

Defendants argue that there is no evidence that the City of San Diego has an unconstitutional policy, custom, or practice that resulted in any constitutional violation, entitling them to summary judgement. (Defs.' Mot. 21:17–22:28.) They add that although Plaintiffs assert various constitutional violations, such as unlawful searches and arrests, the use of excessive force, and the wrongful search of Junior Sialoi's apartment, Plaintiffs fail to show that the "municipality itself" caused any of the alleged violations of constitutional rights. (Id. at 22:20–28.) In response, Plaintiffs direct the Court's attention to Sgt. Sluss' testimony that "pursuant to the city police

1   department's policies and procedures to handcuff anyone who was at this party under

2   these circumstances," and that this would be true "regardless of whether they matched

3   the description of the suspects." (Pls.' Opp'n 22:22–23:5.)

4          Drawing all inferences in favor of the nonmoving party, Plaintiffs' evidence fails

5   to demonstrate a custom or policy that required the police officers, including Sgt. Sluss,

6   to engage in illegal behavior.  See Connick, 131 S. Ct. at 1359; Oviatt, 954 F.2d at

7   1477.   Plaintiffs' use of selective testimony provides no insight into whether "a

8   deliberate choice to follow a course of action [was] made from among various

9   alternatives for establishing *final policy* with respect to the subject matter in question."

10  See Pembaur, 475 U.S. at 481 (emphasis added).  At best, Sgt. Sluss' statement shows

11  that he believes it was appropriate for Plaintiffs to be arrested and treated as they were

12  during the incident to preserve the peace.  Nothing in the statement betrays any

13  reference to a policy or custom of the City of San Diego.  Without reference to any

14  information that illustrates what the City of San Diego's policies actually are, this

15  evidence is little more than a reflection of Sgt. Sluss' subjective interpretation of the

16  policy's relationship to the situation at hand.  Therefore, the Court **GRANTS** summary

17  judgment as to the Monell claim.

18

19      **B.    Negligence**

20          The Fourth Amendment reasonableness standard applies to claims that officers

21  were negligent in using excessive force.  See Young v. Cnty. of Los Angeles, 655 F.3d

22  1156, 1170 (9th Cir. 2011) (citing Munoz v. City of Union City, 120 Cal. App. 4th

23  1077, 1108-09 (2004)).  Unlike § 1983 claims, however, qualified immunity does not

24  insulate police officers for claims brought under California law.  Robinson v. Solano

25  Cnty., 278 F.3d 1007, 1016 (9th Cir. 2002) (en banc) ("California denies immunity to

26  police officers who use excessive force in arresting a suspect.").

27          Though Defendants argue that they responded to the 9-1-1 call appropriately by

28  exercising reasonable care throughout encounter with Plaintiffs, genuine issues of

material facts remain, making summary judgment inappropriate. The issues include, for example, whether the police officers were justified in searching and arresting Plaintiffs, and whether officers used excessive force, among others discussed in greater detail above. Making a determination regarding negligence would again require determining credibility, weighing evidence, and drawing inferences from facts, all of which are inappropriate for the Court to do in summary judgment. See Anderson, 477 U.S. at 355. Therefore, for the same reasons that the Court denied summary judgment for the constitutional-violation claims above, the Court also **DENIES** summary judgment as to negligence. See Young, 2011 WL 3771183, at *12.

### C.   Battery

In California, a plaintiff must prove unreasonable force as an element of a battery action in order to impose liability on police officers. Edson v. City of Anaheim, 63 Cal. App. 4th 1269, 1272 (1998); Cal. Gov't Code § 815.2(a). Such battery claims brought under California law are also analyzed under the Fourth Amendment reasonableness standard. Munoz, 120 Cal. App. 4th at 1102 n.6. And like state-law claims for negligence, § 1983 qualified immunity does not protect officers from battery claims brought under California law. Robinson, 278 F.3d at 1016.

Again, as discussed above, Defendants are not entitled to summary judgment for their use of force because whether the application of force was objectively reasonable remains a genuine issue of material fact. See Edson, 63 Cal. App. 4th at 1272. Therefore, the Court **DENIES** summary judgment as to battery.

### D.   False Arrest / False Imprisonment[3]

"Under California law, a police officer may be liable for false arrest and false imprisonment[.]" Asgari v. City of Los Angeles, 15 Cal. 4th 744, 757 (1997). The tort

---

[3] "'[F]alse arrest' and 'false imprisonment' are not separate torts. False arrest is but one way of committing a false imprisonment, and they are distinguishable only in terminology." Collins v. City & Cnty. of San Francisco, 50 Cal. App. 3d 671, 673 (1975).

11cv2280

of false imprisonment is defined as the "unlawful violation of the personal liberty of another." <u>Fermino v. Fedco, Inc.</u>, 7 Cal. 4th 701, 715 (1994).  The confinement must be "without lawful privilege."  <u>Molko v. Holy Spirit Ass'n</u>, 46 Cal. 3d 1092, 1123 (1988).  "False arrest or imprisonment . . . relat[es] to conduct that is without valid legal authority[.]" <u>Randle v. City & Cnty. of San Francisco</u>, 186 Cal. App. 3d 449, 456 (1986).

Though Defendants move for summary judgment as to all of the state claims, they do not explicitly or specifically explain why the Court should rule in its favor for the false arrest / false imprisonment claim.  (<u>See</u> Defs.' Mot. 23:1–24:19.)  The most that they say regarding this claim is that "[t]here was no false arrest" in their reply brief. (Defs.' Reply 9:20–10:2.)  Defendants appear to derive this conclusion from the presumption that "there was probable cause to arrest G.S. and reasonable suspicion to detain the remaining Plaintiffs." (<u>Id.</u>)  However, as the Court discussed above, there are genuine issues of material fact regarding probable cause and reasonable suspicion as justifications for the police officers' conduct.  Therefore, the Court **DENIES** summary judgment for false arrest / false imprisonment.

### E.   California Civil Code § 52.1

California Civil Code § 52.1 permits an individual to bring a civil action for interference with his rights under the United States or California Constitutions by threats, intimidation, or coercion. <u>Venegas v. Cnty. of Los Angeles</u>, 153 Cal. App. 4th 1230, 1239 (2007).  "Section 52.1 does not provide any substantive protections; instead, it enables individuals to sue for damages as a result of constitutional violations." <u>Reynolds v. Cnty. of San Diego</u>, 84 F.3d 1162, 1170 (9th Cir. 1996), <u>rev'd on other grounds</u>, <u>Acri v. Varian Assocs., Inc.</u>, 114 F.3d 999, 999-1000 (1997).  Plaintiffs' claim under § 52.1 arises from unlawful-seizure and excessive-force claims under the United States Constitution.  Consequently, it is evaluated under the reasonableness standard of the Fourth Amendment. <u>See</u> <u>Jones v. Kmart Corp.</u>, 17 Cal. 4th 329, 331 (1998) (the

1   elements of claims under California Civil Code § 52.1 are essentially identical to claims

2   under 42 U.S.C. § 1983).

3        Relying on Shoyoye v. County of Los Angeles, 203 Cal. App. 4th 947, 959-60

4   (2012), Defendants argue that under § 52.1, "the elements of threats, intimidation or

5   coercion must be distinct from the underlying allegation of a constitutional violation,"

6   and that Plaintiffs fail to make an adequate showing of the necessary elements of

7   threats, intimidation, or coercion.  (Defs.' Mot. 24:1–19.)  Plaintiffs astutely identify

8   this as a broad reading of Shoyoye.  See Bass v. City of Fremont, No. C12-4943, 2013

9   WL 891090, at *5 (N.D. Cal. Mar. 8, 2013).

10       In Bass, the district court rejected the broad reading of Shoyoye, stating that such

11   a reading "would, perversely, preclude any section 52.1 action in which the underlying

12   statutory or constitutional violation involved 'threats, intimidation, or coercion." Id.

13   The court continued that "[t]his reading is contrary to the plain language of the statute,

14   which specifically provides for a civil action based on interference with a right "by

15   threats, intimidation, or coercion."  Id. (citing Cal. Civ. Code §52.1(b)).  It also

16   concluded that a broad reading of Shoyoye is also contrary to Venegas, "in which the

17   California Supreme Court held that section 52.1 provides redress for 'threats,

18   intimidation, or coercion that interferes with a constitutional or statutory right,' and

19   accordingly, permitted a claim to proceed based on allegations of interference with the

20   plaintiffs' right to be free from unreasonable searches and seizures."  Id.  This Court

21   rejects Defendants' interpretation of Shoyoye, and adopts the Bass Court's reasoning

22   and conclusion.[4]  See Bass, 2013 WL 891090, at *5-6.

23       Defendants also briefly argue that "any claims for a violation of Civil Code

24   section 52.1 that flow from the reasonable detentions and reasonable use of force . . .

25   fail as a matter of law."  (Defs.' Reply 9:26–10:2.)  However, because the reasonableness

26   of the arrest / detentions and the use of force remain in dispute, the Court cannot

27

28       [4] The Court notes that Defendants did not address the application of Shoyoye in their reply brief, which suggests that they may have abandoned the argument.

-22-

conclude that Plaintiffs' § 52.1 claim fails as a matter of law.  Therefore, summary judgment is not appropriate at this time.

Accordingly, the Court **DENIES** summary judgment as to Plaintiffs' claim for civil-rights violations brought under California Civil Code § 52.1

## IV.    CONCLUSION & ORDER

In light of the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment.  (Doc. 36.)  Specifically, the Court **GRANTS** summary judgment as to Plaintiffs' <u>Monell</u> claim brought under 42 U.S.C. § 1983, and **DENIES** summary judgment as to all other remaining issues.

**IT IS SO ORDERED.**

**DATE: December 9, 2013**

**HON. THOMAS J. WHELAN**
United States District Court
Southern District of California

11cv2280